## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **DENVER JOE McMATH, JR., #499263,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **NO. 3:20-cv-00325** |
| | ) | |
| **MARTIN FRINK, Warden,[1]** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

Denver McMath, an inmate at the Trousdale Turner Correctional Center in Hartsville, Tennessee, is serving a 140-year prison sentence. He has filed a pro se Petition for the Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. No. 1), challenging the constitutionality of his state conviction. In response, Respondent filed the transcript of proceedings in state court (Doc. No. 15) and an Answer to the Petition (Doc. No. 16). Petitioner subsequently filed a Reply to Respondent's Answer. (Doc. No. 33). He also filed a Motion to Amend his Petition (Doc. No. 32), a Motion for Extension of Time to file a memorandum in support of his Motion to Amend (Doc. No. 34), and a Motion to Appoint Counsel. (Doc. No. 36).

This matter is fully briefed and ripe for the Court's review. Respondent does not dispute that the Petition is timely and that this is Petitioner's first Section 2254 petition related to this conviction. (Doc. No. 16 at 1). Having reviewed Petitioner's arguments and the underlying record,

---

[1] On December 13, 2021, Petitioner notified the Court that the prison where he is incarcerated had a new warden, Mr. Martin Frink. (Doc. No. 26). As the proper respondent to a petition under Section 2254 is the warden of the institution where the petitioner is in custody, Rumsfeld v. Padilla, 542 U.S. 426, 434 (2004) (citing 28 U.S.C. §§ 2242, 2243), the proper respondent here is Warden Frink, rather than former Warden Russell Washburn. In the Order accompanying this Memorandum Opinion, the Clerk will be directed to make this change on the docket.

the Court finds that an evidentiary hearing is not required, and that it would be futile to allow amendment of the Petition as requested. As explained below, Petitioner is not entitled to relief under Section 2254, and his Petition and pending motions will therefore be denied.

## I. PROCEDURAL HISTORY

After being indicted on charges of aggravated sexual battery (four counts) and rape of a child (four counts), Petitioner was convicted on all counts on August 24, 2011, and given an effective sentence of 140 years in prison. (Doc. No. 15-1 at 54–61). Trial counsel was allowed to withdraw from the representation after sentencing (see id. at 62), and newly appointed counsel represented Petitioner first in seeking a new trial (id. at 62–69), and then on appeal from his conviction and sentence.

The Tennessee Court of Criminal Appeals (TCCA) affirmed the trial court's judgment on direct appeal. State v. McMath, No. M2012-01260-CCA-R3CD, 2013 WL 5918733 (Tenn. Crim. App. Nov. 1, 2013); (Doc. No. 15-11). The Tennessee Supreme Court denied discretionary review on March 5, 2014. (Doc. No. 15-15).

Petitioner subsequently filed for post-conviction relief in the trial court, where an evidentiary hearing was held on May 3, 2017. (Doc. No. 15-18). The post-conviction trial court denied relief on November 21, 2017. (Doc. No. 15-17 at 3–6). On June 10, 2019, the TCCA affirmed the denial of post-conviction relief. McMath v. State, No. M201702426CCAR3PC, 2019 WL 2420559, at *1 (Tenn. Crim. App. June 10, 2019); (Doc. No. 15-23). Petitioner was denied permission to appeal to the Tennessee Supreme Court on October 14, 2019. (Doc. No. 15-24). Petitioner then timely filed his pro se Petition under Section 2254.

# II. STATEMENT OF FACTS

A.  <u>Evidence at Trial</u>

The TCCA on direct appeal produced a summary of the proof at trial, which it also utilized as the factual record for purposes of adjudicating certain issues on post-conviction appeal, because Petitioner had failed to file the trial transcript as an exhibit to the post-conviction evidentiary hearing. See <u>McMath v. State</u>, 2019 WL 2420559, at *7. This factual summary is reproduced in its entirety below:

> The victim was born on September 5, 1990. [The petitioner] was her mother's boyfriend and the father of her younger half-brother. At the time of the crimes, the victim lived with [the petitioner], her mother, her half-brother, her two sisters, and her older brother.
>
> The victim recalled that the first incident happened during the winter of her fourth grade year. She testified that [the petitioner] told her to come into his bedroom and sit beside him on the bed. [The petitioner] kissed the victim, inserting his tongue into her mouth, and then gave her some coloring books. On another occasion, [the petitioner] went into the victim's bedroom and touched her breasts, with his hand on top of her clothes, while she was sleeping in her bed. The victim testified that one night, "late at night," [the petitioner] went into her bedroom where she and her twin sister were sleeping, and performed oral sex on her. She testified that [the petitioner] pulled her pants down and put his mouth on her vagina.
>
> The victim recalled an incident when she was in the sixth grade and [the petitioner] made her perform oral sex on him in the laundry room of their house. The victim did not know what oral sex was, and [the petitioner] told her to "put [her] mouth on it, and [she] had no choice." The victim testified that it happened "[a] lot." She testified that [the petitioner] ejaculated in her mouth. She testified that she was afraid that if she did not do as [the petitioner] told her, [the petitioner] would beat her. She testified, "he always beat[ ] us." The victim testified that she could not count the number of times she performed oral sex on [the petitioner]. She recalled the incident in the laundry room and another occasion in the kitchen. On one occasion, her older brother walked into the laundry room while the victim was performing oral sex on [the petitioner], and [the petitioner] "just started beating him."
>
> The victim also testified that [the petitioner] called her downstairs to watch pornography with him. She testified that [the petitioner] was masturbating while watching two people on television have sex. [The petitioner] then told the victim to go to the laundry room, where he made her perform oral sex on him. She testified,

3

"[o]ne time, he had called me downstairs and he was rolling up weed and then he smoked it and then told me to smoke it." The victim smoked the marijuana and then went upstairs, but she was not feeling "normal" and she thought she was "high." [The petitioner] called her back downstairs and made her perform oral sex on him.[2]

On another occasion, the victim fell asleep in her mother's bedroom while watching her youngest brother while her mother was at work. She awoke to [the petitioner] touching her. The victim recalled another incident when [the petitioner] touched her chest in the living room. She testified, "[I] was just scared and I told him -- I told him that I was going to tell my mother and he said [']you tell [,] I'm going to kill you.[']"

The victim testified that the abuse ended when she was in eighth grade after the family moved to another residence. [The petitioner] "stayed there on and off." The victim's older brother told the victim's mother about the abuse when the victim was in the tenth grade.

The victim's older brother testified that [the petitioner] physically abused him as a child. He recalled an incident when his mother was in the hospital giving birth to his younger brother, and [the petitioner] told him to watch for a cab that was coming to pick him up. After waiting for awhile and not seeing a cab, he went upstairs to tell [the petitioner]. When he walked inside the bedroom he saw [the petitioner] "on the bed with his thang out and [the victim] was in the room with him." He testified that [the petitioner]'s penis was erect. On another occasion, at 2:30 or 3:00 a.m., the victim's brother saw [the petitioner] "on top of [the victim] giving her oral sex" in the living room. On another occasion, the victim's brother was outside and he saw [the petitioner] and the victim through the window in the laundry room. He testified "just something was awkward ...." He testified that in 2007, during an argument with the victim, he told his mother that [the petitioner] had abused the victim in the past.[3]

The victim's mother testified that she and [the petitioner] lived together with her five children for 15 years. She testified that [the petitioner] never had a "steady job" and that he "demanded money" from her. She testified that when the victim was 16 years old, she discovered that [the petitioner] had previously molested the victim. The victim's mother confronted [the petitioner] with the allegation, and [the petitioner] initially denied it. [The petitioner] then said, "'if I did do it I was on drugs and alcohol.'" During the investigation of this case, the victim's mother

---

[2] After seating the jury but prior to beginning the proof, the trial court held a jury-out hearing to determine the admissibility under Tennessee Rule of Evidence 404(b) of this testimony involving Petitioner's use of pornography and marijuana. (See Doc. No. 15-2).

[3] In 2018, over seven years after testifying against Petitioner, the victim's older brother executed an affidavit generally recanting the "false statements" he had made in his trial testimony. (Doc. No. 32 at 6–7). However, as discussed later in this Opinion, that affidavit does not meet the applicable criteria for admission on the record of this case in support of any claim for habeas relief.

4

attempted to speak to [the petitioner] while wearing a "wire," but [the petitioner] refused to meet with her and said, "Bitch, you're trying to set me up." The victim's mother received a letter from [the petitioner] to his son, the victim's younger brother, that contained a drawing of a woman with a gun to her head. She received the letter on the Saturday prior to testifying in this case. She perceived the drawing as a threat.

Melinda Evans, an investigator with the Tennessee Department of Children's Services, testified that she investigated the allegations against [the petitioner] after the victim's twin sister disclosed information about the abuse to someone at school. She testified that the victim was "initially very reserved and very reluctant" to speak to her. The victim told Ms. Evans that [the petitioner] had touched her breasts and buttocks on top of her clothes. The victim was 17 years old at the time of the interview and stated that the incidents happened four years prior. The victim denied that she had ever touched [the petitioner].

Eric Fitzgerald, of the Sex Crimes Unit of the Metro Nashville Police Department, testified that he interviewed the victim. Detective Fitzgerald testified that the victim was initially a "little stand-offish," but that she eventually described the events, which she stated began when she was in fourth grade. She told Detective Fitzgerald that it started as kissing, then [the petitioner] touched her breasts outside her clothes, then inside her clothes, and her vagina, and eventually, [the petitioner] performed oral sex on the victim and had the victim perform oral sex on him. Detective Fitzgerald also interviewed the victim's older brother, who had witnessed some incidents of abuse.

[The petitioner] did not testify or present any proof at trial.

Id. at *1–3.

Prior to resting its case, the State read the following election of offenses to the jury:

Count one, aggravated sexual battery, refers to the testimony that the [petitioner] touched the victim's breast over her clothes when she slept on the bottom bunk in her bedroom.

Count two, aggravated sexual battery, refers to the testimony that the [petitioner] touched the victim's breast under her clothes on the skin when she slept on the bottom bunk in her bedroom.

Count three, aggravated sexual battery, refers to the testimony that the [petitioner] touched the victim's breasts when she was laying in the bed with her little brother in her mother's bedroom.

Court four, aggravated sexual battery, refers to the testimony that the [petitioner] touched the victim's breast when she sat on a chair in the living room when she told

5

the [petitioner] that she was going to tell her mother and he threatened he would kill her if she did.

Count five, rape of a child, refers to the testimony that the [petitioner] came into the victim's bedroom at night and performed cunnilingus on her.

Count six, rape of a child, refers to the first incident the victim could recall of performing fellatio on the [petitioner] before which he instructed her how to do it.

Count seven, rape of a child, refers to the testimony that the victim performed fellatio on the [petitioner] in the laundry room after he showed her pornography on the television.

Count eight, rape of a child, refers to the testimony that the victim performed fellatio on the [petitioner] in the kitchen after the [petitioner] told her to smoke marijuana.

(Doc. No. 15-4 at 7–9).

The jury, which included among its members former Tennessee Governor Phil Bredesen, heard closing arguments, was charged, and rendered a verdict of guilty on all counts. Petitioner was later sentenced at a hearing where the following discussion and rulings occurred after counsel (Ms. Reddick for the State and Mr. Colavecchio for Petitioner) had argued their sentencing positions:

MS. REDDICK: Just a reminder to Mr. Colavecchio that, given the age of these offenses, the dates of the offenses, he has to elect which sentencing structure he wants to be sentenced under, old or new.

MR. COLAVECCHIO: Well, I believe these were all pre-Blakely.

THE COURT: Well, it is eight to twelve and fifteen to twenty-five. Right?

MR. COLAVECCHIO: Yes.

MS. REDDICK: No. I am referring to the – whether or not Your Honor considers – starts in the middle of the range and moves up, considering only the felony conviction, which he does have; or, could start at the beginning but considers all factors.

THE COURT: All right. Well, either way.

6

MR. COLAVECCHIO:    We would elect to start at the bottom end –

THE COURT:    Bottom range. That's fine. All right. Well –

MR. MOORE:    And I hate to interrupt, but this is one you don't start at the bottom of the range it it's under the new law. The Court just considers all the enhancement factors so that there is no real starting point by the terms of the statute.

MR. COLAVECCHIO:    Yes.

THE COURT:    All right. All that having been said, the Court, first of all, has to consider sentencing considerations. . . .

(Doc. No. 15-7 at 14–16). The trial court proceeded to find that five statutory enhancement factors applied, that no statutory mitigating factors applied, and that the appropriate sentence was 10 years (in the middle of the applicable range)[4] for each aggravated sexual battery conviction and 25 years (at the top of the applicable range)[5] for each child rape conviction, all of which would run consecutively for a total effective sentence of 140 years. (Id. at 16–17).

B.    Post-Conviction Proceedings

After reciting is previously published summary of the evidence at trial, the TCCA provided the following summary of the evidence from Petitioner's post-conviction evidentiary hearing, as relevant to the issues raised on appeal:

The first witness called by the petitioner was Woodrow Ledford, an investigator with the Metro Police Department. Investigator Ledford testified he was involved in the investigation of the petitioner but could not remember if a "controlled phone call" was made in this case. Investigator Ledford did, however, admit if a recording was made of such a call it would have been turned over to the District Attorney's Office.

The petitioner then testified concerning his claims against trial counsel and appellate counsel. While admitting trial counsel provided him with a copy of discovery and discussed the State's case against him, the petitioner claimed trial

---

[4] See Tenn. Code Ann. § 40-35-112(a)(2) (establishing a Range I sentence for a Class B felony as "not less than eight (8) nor more than twelve (12) years").

[5] See id. § 40-35-112(a)(1) (establishing a Range I sentence for a Class A felony as "not less than fifteen (15) nor more than twenty-five (25) years").

7

counsel failed to sufficiently communicate with him. The petitioner, who was incarcerated prior to trial, also stated trial counsel did not provide him with a copy of the CD which contained some of the State's discovery. The petitioner admitted trial counsel reviewed the CD but did not discuss it with the petitioner after doing so.

While admitting trial counsel sought funds for and hired an investigator as part of his defense, the petitioner claimed trial counsel never discussed the investigator's findings with him. The petitioner admitted, however, that he met with the investigator. The petitioner also stated trial counsel failed to find potential witnesses he felt would have been "pertinent to my case." Though the petitioner failed to provide specific names, he testified trial counsel should have subpoenaed individuals from the children's' day care and school.

Next, the petitioner testified trial counsel failed to properly "challenge the indictments." While admitting trial counsel requested a bill of particulars, the petitioner claimed the State's response was not specific enough, and he asked counsel to renew his motion and request a more specific response. According to the petitioner, trial counsel did not make a second request of the State.

The petitioner also claimed trial counsel was ineffective for failing to cross-examine certain witnesses. According to the petitioner, both the victim's mother and the victim gave inconsistent statements prior to trial and trial counsel failed to adequately cross-examine them about the inconsistencies. For example, the petitioner testified the victim initially claimed one incident occurred upstairs and then she later testified the same incident took place downstairs, and trial counsel failed to sufficiently cross-examine the victim concerning this inconsistency.

Next, the petitioner testified counsel was ineffective for allowing him to be sentenced under the wrong sentencing act. According to the petitioner, his crimes were committed prior to the 2005 amendment to the sentencing statute, yet he was sentenced under the new statute which allowed the trial court to rely on certain enhancement factors that should not have been considered.

Trial counsel, who represented the petitioner after arraignment through sentencing, testified he has been practicing criminal law for twenty years and has handled forty to fifty jury trials. Trial counsel stated that upon receiving discovery from the State, he mailed a copy of the discovery to the petitioner. Trial counsel reviewed a CD provided by the State and discussed the contents of the CD with the petitioner as well as answered any questions the petitioner had about the discovery and the evidence in his case.

As trial counsel and the petitioner prepared for trial, they "expected some of the testimony to not be consistent with each other" based on the discovery provided by the State. However, trial counsel noted that the inconsistencies were not related to the elements of the crimes charged but differences such as "it happened in the

afternoon or it happened at night." Trial counsel not only pointed these differences and inconsistences out during the witnesses' testimony but also summarized them during his closing argument.

Trial counsel filed "a bill of particulars that asked specific questions – dates, times, places, details on the specifics of the allegation." However, the State's first response was not very specific, so he requested more information and received a "more detailed Election of Offenses where the specifics were discussed about how and when and all that."

When questioned about the advice he provided concerning the petitioner's sentencing options, trial counsel testified they discussed the fact the petitioner had an option about "which act to be sentenced under. And we chose one, and I believe that's on the record, and there was no issue about it at that time." According to trial counsel, he met with the petitioner on two occasions prior to the sentencing hearing and advised the petitioner of his options under each act during their first meeting.

The final witness was the petitioner's appellate counsel. Appellate counsel testified he has been practicing for thirteen years during which time he has handled twenty-five criminal jury trials and several criminal appellate matters. Appellate counsel was assigned to the petitioner's case after the sentencing hearing and, therefore, he handled both the motion for new trial and the petitioner's appeal. In preparing both the motion for new trial and the appeal, appellate counsel spoke with and exchanged numerous letters with the petitioner. Appellate counsel also spoke with trial counsel and reviewed the record.

While appellate counsel and the petitioner agreed on some issues to include in the motion for new trial and on appeal, such as some evidentiary issues and consecutive sentencing, appellate counsel did not believe other issues the petitioner wished to pursue had merit, such as the bill of particulars and prosecutorial misconduct. Appellate counsel, therefore, only raised those issues which, in his experience, provided the petitioner with the best opportunity to obtain relief.

When questioned specifically as to why he did not raise the issue of whether the petitioner was sentenced under the appropriate sentencing act, appellate counsel testified that his review of the sentencing hearing transcript revealed the issue had been discussed during the hearing with the petitioner and the petitioner had made an informed decision. Therefore, appellate counsel did not raise the issue on appeal.

McMath v. State, 2019 WL 2420559, at *3–5.

### III. CLAIMS PRESENTED FOR REVIEW

The pro se Petition in this Court asserts the following five claims:

(1)     The State's bill of particulars was insufficient to state the offenses with specificity.

9

(2)     The trial court erred by allowing into evidence the testimony of three State's witnesses, as the testimony constituted inadmissible character evidence and inadmissible hearsay.

(3)     The trial court erred by allowing the State to introduce into evidence a drawing enclosed with a letter from Petitioner to his son and the victim's mother.

(4)     The trial court erred in sentencing Petitioner.

(5)     Petitioner received ineffective assistance of counsel at trial and on appeal.

(Doc. No. 1 at 5, 7–8, 10, Doc. No. 1-1; see also Doc. No. 2 at 4).[6]

## IV. LEGAL STANDARD

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious effect or influence" upon the conviction. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Peterson v. Warren, 311 F. App'x 798, 803–04 (6th Cir. 2009).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" Woodford v. Garceau, 538 U.S. 202, 206 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 436 (2000)). AEDPA's requirements "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." Uttecht

---

[6] Petitioner purports to assert a sixth claim. (See Doc. No. 1-1 at 2–3; Doc. No. 2 at 4). However, as discussed below, his "Claim #6" is in fact an argument that his post-conviction counsel's ineffectiveness is to blame for his failure to exhaust most of the claims of ineffective assistance of counsel asserted in Claim 5. (Doc. No. 1-1 at 2–3; Doc. No. 2 at 55).

v. Brown, 551 U.S. 1, 10 (2007) (citations omitted). As the Supreme Court has explained, AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington v. Richter, 562 U.S. 86, 102–03 (2011) (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979)). Prior to the passage of AEDPA, district courts applied de novo review to determine whether "the relevant state court had erred on a question of constitutional law or on a mixed constitutional question." Williams v. Taylor, 529 U.S. 362, 402 (2000) (O'Connor, J., concurring). But now, where state courts have ruled on the merits of a claim, AEDPA imposes "a substantially higher threshold" for obtaining relief than a de novo review of whether the state court's determination was incorrect. Schriro v. Landrigan, 550 U.S. 465, 473 (2007) (citing Williams, 529 U.S. at 410).

Specifically, a federal court may not grant habeas relief on a claim rejected on the merits in state court unless the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2). The Supreme Court has repeatedly held "that AEDPA, by setting forth [these] necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.'" White v. Wheeler, 577 U.S. 73, 77 (2015) (quoting Burt v. Titlow, 571 U.S. 12, 19 (2013)).

A state court's legal decision is "contrary to" clearly established federal law under Section 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court

11

has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412–13. An "unreasonable application" under this subsection occurs when "the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413; White v. Woodall, 572 U.S. 415, 426 (2014). A state court decision is not unreasonable under this standard simply because the federal court, "in its independent judgment," finds it erroneous or incorrect. Williams, 529 U.S. at 411. Rather, to be actionable under Section 2254(d)(1), the state court's decision "'must be objectively unreasonable, not merely wrong; even clear error will not suffice.'" Woods v. Donald, 575 U.S. 312, 316 (2015) (quoting Woodall, 572 U.S. at 419). An objectively unreasonable decision is one "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at 103.

Similarly, a district court on habeas review may not find a state court factual determination to be unreasonable under Section 2254(d)(2) simply because it disagrees with the determination. Young v. Hofbauer, 52 F. App'x 234, 237 (6th Cir. 2002). Rather, the determination must be "objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). "If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's . . . determination." Brumfield v. Cain, 576 U.S. 305, 314 (2015) (quoting Wood v. Allen, 558 U.S. 290, 301 (2010)) (internal quotation marks omitted). Moreover, a state court's factual determinations "shall be presumed to be correct" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see also Davis v. Ayala, 576 U.S. 257, 271 (2015) ("State-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing

12

evidence.'") (quoting Rice v. Collins, 546 U.S. 333, 338–39 (2006)). Finally, the petitioner may

not prevail under Section 2254(d)(2) simply by showing that a fact was unreasonably determined;

he "must show that the resulting state court decision was 'based on' that unreasonable

determination." Rice v. White, 660 F.3d 242, 250 (6th Cir. 2011).

The standard set forth in 28 U.S.C. § 2254(d) for granting relief on a claim rejected on the

merits by a state court "is a 'difficult to meet' and 'highly deferential standard for evaluating state-

court rulings, which demands that state-court decisions be given the benefit of the doubt.'" Cullen

v. Pinholster, 563 U.S. 170, 181 (2011) (quoting Richter, 562 U.S. at 102, and Woodford v.

Visciotti, 537 U.S. 19, 24 (2002) (per curiam)). This standard "was meant to be" a high hurdle for

petitioners, consistent with the principle that habeas corpus functions as a guard against only

"extreme malfunctions" in the state's administration of criminal justice. Harrington, 562 U.S. at

102; see also Woods, 575 U.S. at 316.

Even AEDPA's demanding review is ordinarily only available to state inmates who have

fully exhausted their remedies in the state court system. 28 U.S.C. §§ 2254(b) and (c) provide that

a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with

certain exceptions, the prisoner has presented the same claim sought to be redressed in a federal

habeas court to the state courts. Pinholster, 563 U.S. at 182; Kelly v. Lazaroff, 846 F.3d 819, 828

(6th Cir. 2017) (quoting Wagner v. Smith, 581 F.3d 410, 417 (6th Cir. 2009)) (petitioner must

present the "same claim under the same theory" to the state court). This rule has been interpreted

by the Supreme Court as one of total exhaustion, Rose v. Lundy, 455 U.S. 509 (1982), meaning

that each and every claim set forth in the federal habeas corpus petition must have been presented

to the state appellate court.[7] Picard v. Connor, 404 U.S. 270 (1971); see also Pillette v. Foltz, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review"). Moreover, the substance of the claim must have been presented as a federal constitutional claim. Gray v. Netherland, 518 U.S. 152, 162–63 (1996).

The procedural default doctrine complements the exhaustion requirement, to ensure that the state has a meaningful opportunity to address the merits of its convicts' claims of constitutional error before those claims are entertained in federal court. See Edwards v. Carpenter, 529 U.S. 446 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). Under this doctrine, a claim is procedurally defaulted and thus ordinarily barred from federal habeas review if the state court decides it on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim. Wainwright v. Sykes, 433 U.S. 72, 81–82 (1977); see also Walker v. Martin, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment."); Coleman v. Thompson, 501 U.S. 722 (1991) (same). If a claim has never been presented to the state courts, but a state court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim or state law deems the claim waived),[8] then the claim is technically exhausted, but procedurally barred. Coleman, 501 U.S. at 731–32.

---

[7] In Tennessee, the Court of Criminal Appeals is the highest appellate court to which appeal must be taken in order to properly exhaust a claim. See Tenn. Sup. Ct. R. 39; Adams v. Holland, 330 F.3d 398, 402–03 (6th Cir. 2003).

[8] The Tennessee Post-Conviction Procedure Act provides that "[i]n no event may more than one (1) petition for post-conviction relief be filed attacking a single judgment," and establishes a one-year statute of limitations for filing that one petition. Tenn. Code Ann. § 40-30-102(a) and (c). The Act further provides that "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it

14

If a claim is procedurally defaulted under either of the above scenarios, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. Lucas v. O'Dea, 179 F.3d 412, 418 (6th Cir. 1999) (citing Coleman, 501 U.S. at 754). "'[C]ause' under the cause and prejudice test must be something *external* to the petitioner, something that cannot fairly be attributed to him[,] . . . some objective factor external to the defense [that] impeded . . . efforts to comply with the State's procedural rule." Coleman, 501 U.S. at 753 (emphasis in original). Examples of cause include the unavailability of the factual or legal basis for a claim or interference by officials that makes compliance "impracticable." Id. To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." Perkins v. LeCureux, 58 F.3d 214, 219 (6th Cir. 1995) (quoting United States v. Frady, 456 U.S. 152, 170 (1982)); see also Ambrose v. Booker, 684 F.3d 638, 649 (6th Cir. 2012) (finding that "having shown cause, petitioners must show actual prejudice to excuse their default"). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." Simpson v. Jones, 238 F.3d 399, 409 (6th Cir. 2000). Likewise, if a petitioner cannot establish prejudice, the question of cause is immaterial.

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of

---

for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented," unless that ground could not be presented due to unconstitutional state action, or is based on a new and retroactive constitutional right that was not recognized at the time of trial. Id. § 40-30-106(g).

one who is "actually innocent" of the substantive offense. Dretke v. Haley, 541 U.S. 386, 392 (2004) (citing Murray v. Carrier, 477 U.S. 478, 495–96 (1986)); accord Lundgren v. Mitchell, 440 F.3d 754, 764 (6th Cir. 2006).

## V. ANALYSIS

Petitioner raises five habeas claims. In response to the first four—which assert errors committed by either the court or the prosecution during trial and sentencing—Respondent raises the defense of procedural default, arguing that while Petitioner presented those claims to the state courts, he did so without asserting any federal constitutional violation. (See Doc. No. 16 at 17–18, 22–23, 25). Respondent argues that, because state law prevents Petitioner from returning to state court to present his claims as federal claims, they have been defaulted and are barred from adjudication in this habeas case. (Id. (citing Tenn. Code Ann. § 40-30-102(c)). Respondent is correct.

### A. Unexcused Procedural Default of Claims 1–4

Petitioner did in fact present Claims 1 through 4 to the TCCA on direct appeal, but not as federal constitutional claims. Instead, he argued that the trial court erred in allowing testimony that was improper under Tennessee Rules of Evidence 401, 403, and 404 (Doc. No. 15-9 at 8–20); that the court erred in applying sentence-enhancement factors and imposing consecutive sentences under the statutory sentencing scheme, Tenn. Code Ann. § 40-35-101 et seq. (id. at 21–32)[9]; that the court erred under Tennessee Rule of Evidence 403 in admitting into evidence a letter from

---

[9] Notably, Petitioner has failed *in this Court* to assert any federal constitutional violation resulting from the sentencing error he alleges, which is that the trial court misapplied enhancement factors and erroneously imposed consecutive sentences under state law. (Doc. No. 1 at 10; Doc. No. 2 at 29–35). Claim 4 is subject to dismissal on this basis alone. See Hagerman v. Minter, No. 317CV00549JRGHBG, 2019 WL 148661, at *7 (E.D. Tenn. Jan. 9, 2019) (finding that, "to the extent Petitioner is asserting that her sentence violated the 1989 Sentencing Act, which is state law," the claim was noncognizable and the court had "no warrant to review" it as a habeas claim) (citing 28 U.S.C. § 2254(a) (federal habeas relief is available only if an inmate is being held "in violation of the Constitution or laws or treaties of the United States")).

Petitioner to his young son (id. at 32–35); and, that the court erred in failing to order the State to answer his bill of particulars under Tennessee Rule of Criminal Procedure 7(c). (Id. at 35–37).

"[B]oth Congress and federal habeas courts have set out strict rules requiring prisoners to raise all of their federal claims in state court before seeking federal relief." Shinn v. Ramirez, 142 S. Ct. 1718, 1731–32 (2022). Consequently, "[t]he federal courts do not have jurisdiction to consider a claim in a habeas petition that was not 'fairly presented' to the state courts" as a federal claim. McMeans v. Brigano, 228 F.3d 674, 681 (6th Cir. 2000) (quoting Franklin v. Rose, 811 F.2d 322, 324–25 (6th Cir. 1987)). Fair presentation requires the habeas claim to have first been advanced "under the same theory" in state court. Kelly, 846 F.3d at 828 (citation omitted). "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." Anderson v. Harless, 459 U.S. 4, 6 (1982) (citations omitted).

Petitioner's arguments on direct appeal were based entirely on state law and did not rely on cases employing federal constitutional analysis, facts within the mainstream of constitutional law, or any other material sufficient to alert the TCCA that a federal constitutional violation was also being claimed. See McMeans, 228 F.3d at 681–82 (listing criteria for finding federal claim fairly presented in state court; finding issue not fairly presented where petitioner "focused entirely" on state law and "did not cite any federal precedent" in advancing claim). Nor does the TCCA's opinion give any indication that it perceived any federal claim to be asserted or implied by Petitioner's arguments. His federal claims were thus not fairly presented to the courts of the state. Because Petitioner is now barred from presenting these federal claims in state court by Tennessee's post-conviction statute of limitations, single-petition rule, and waiver rule, see Tenn. Code Ann. §§ 40-30-102(a) and (c), 40-30-106(g), Claims 1 through 4 are defaulted.

Citing Martinez v. Ryan, 566 U.S. 1 (2012), Petitioner asserts that cause for the default lies in his post-conviction counsel's ineffectiveness in failing to raise these federal claims during post-conviction proceedings. (See Doc. No. 33, Petitioner's Reply, at 2–4, 6). But Martinez "treats ineffective assistance by a prisoner's state postconviction counsel as cause to overcome the default of a single claim—ineffective assistance of trial counsel—"and the Supreme Court has not permitted any extension of Martinez's holding to other claims. Davila v. Davis, 137 S. Ct. 2058, 2062 (2017).

Petitioner also asserts the ineffectiveness of his counsel on direct appeal, but only as a freestanding Sixth Amendment claim (Claim 5), not as cause for the default of Claims 1 through 4. He does not contend in Claim 5 that appellate counsel was ineffective in failing to present claims related to the bill of particulars, erroneous evidentiary rulings, or sentencing as federal claims. Even if such failures had been cited as cause excusing procedural default, Petitioner's ineffective-assistance-of-appellate-counsel claim is likewise barred by its unexcused procedural default, as discussed below; accordingly, it cannot serve as cause excusing the default of Claims 1 through 4. Edwards v. Carpenter, 529 U.S. 446, 450–51 (2000) ("[A] procedurally defaulted ineffective-assistance-of-counsel claim can serve as cause to excuse the procedural default of another habeas claim only if the habeas petitioner can satisfy the 'cause and prejudice' standard with respect to the ineffective-assistance claim itself.").

Nor does Petitioner assert grounds for bypassing his unexcused default on the basis of his actual innocence. See, e.g., Dretke v. Haley, 541 U.S. at 392. Though Petitioner asserts that he has "maintained his innocence from the beginning of the case" (Doc. No. 33 at 4), he does not appear to claim that he is actually innocent (i.e., that he is innocent in fact, rather than merely deserving of acquittal) and therefore that, even absent cause for the default, his defaulted claims must be

reviewed to avoid a miscarriage of justice. To obtain habeas review under this "narrow exception" to the procedural-default rule, Dretke, 541 U.S. at 393, Petitioner would need to demonstrate his factual innocence, not the mere legal insufficiency of the State's proof; a miscarriage-of-justice claim is not supported by an assertion of mere legal innocence. Lee v. Brunsman, 474 F. App'x 439, 442 (6th Cir. 2012) (citing Bousley v. United States, 523 U.S. 614, 623 (1998), and Calderon v. Thompson, 523 U.S. 538, 559 (1998)).

Petitioner does not claim factual innocence; rather, he asserts an incoherence between his conviction of eight offenses and what he represents as the victim's trial testimony describing only two instances of sexual misconduct (Doc. No. 33 at 1–2), combined with the lack of "physical evidence" in his case. (Id. at 4). To the extent that Petitioner is claiming to be innocent of six of the eight counts of conviction based on the victim's testimony to "only one count of aggravated sexual battery and one count of rape of a child" (id. at 1, 2 (citing Doc. No. 15-2 and referring to it as "the trial transcript")), the claim is unfounded, as the testimony he relies on came not from the State's proof to the jury, but from the pretrial motions hearing (held outside the presence of the jury) under Tennessee Rule of Evidence 404(b) to determine the admissibility testimony describing his use of pornography and marijuana. (See Doc. No. 15-2). The victim's actual trial testimony described encounters which aligned with all eight indicted charges, as elucidated in the State's election of offenses. (See Doc. No. 15-4 at 7–9). In short, Petitioner's innocence claim is not helped by his citation to the record as he misperceives it, nor by his objection to the lack of physical evidence of abuses that were charged several years after their occurrence.

Finally, Petitioner's Reply can be liberally construed as asserting his innocence vis-à-vis his consecutive sentencing to 140 years in prison, on grounds that only two of the four sentence-enhancement factors applied in his case were proper (Doc. No. 33 at 6) and his sentence is therefore

illegal unless it is "adjusted to [35 years]." (Id.). But even if actual innocence would allow for habeas review of a defaulted challenge to Petitioner's noncapital sentence, see Gatewood v. United States, 979 F.3d 391, 395 n.1 (6th Cir. 2020) (noting that "it is an open question in this circuit" whether actual innocence can excuse default in challenge to noncapital sentence, as it can in challenges to capital sentences and to convictions), Petitioner does not assert his factual innocence, so no such excuse for the default of the sentencing claim in this case is available. See id.

Accordingly, Claims 1 through 4 are barred from habeas review.

B. Claim 5: Ineffective Assistance of Counsel

In Claim 5 of the Petition, 17 grounds (or sub-claims) are asserted in support of Petitioner's claim that he received the ineffective assistance of trial and appellate counsel. (See Doc. No. 1-1 at 1–2 (enumerating 18 grounds but omitting #12)). Three additional grounds are included in his supporting Memorandum (see Doc. No. 2 at 39 & n.2), bringing the count to 20. Of these ineffective-assistance sub-claims, sub-claims 1–14 and 17–20 assert trial counsel's ineffectiveness (id. at 39, 76–78), while sub-claims 15 and 16 assert appellate counsel's ineffectiveness. (Id. at 39). In total, Petitioner claims that trial counsel provided constitutionally ineffective assistance by failing to:

1) provide a copy of [digital] discovery;
2) sufficiently cross-examine witnesses;
3) challenge [with a] Motion to Dismiss;
4) advise the Petitioner of the applicable sentencing guidelines;
5) object to prosecutorial misconduct during closing arguments;
6) demand the court order the prosecution to provide a renewed bill of particulars and challenge the insufficient indictment matter in timely manner with proper authority;
7) build a proper trial strategy for petitioner's best interest;
8) challenge the sufficiency of evidence and argue the rule of cancellation for count #8 during election of offenses;
9) introduce . . . all other contents that accompanied a drawing that was alleged to threat[en] the victim's mother;
10) challenge the Brady act/violation;

20

11) subpoena the investigating detective regarding his actual investigation and controlled phone conversation between petitioner and victim's mother;

12) subpoena a witness[ ] from a day care center . . . the alleged victim and her siblings attended in regards to the alleged abuse and beating;

13) impeach Mr. Hawk where he alleged he was physically abused for years by the petitioner;

14) challenge a conflict of interest where he did not exclude the former Governor, Phil Bredesen, as a juror;

. . .

17) challenge double jeopardy on counts 3, 4 and 6;

18) provide . . . adequate advice on plea matter and deliver the state's 10-year offer to petitioner which was favor[able] to petitioner;

19) provide . . . adequate advice on constitutional right to testify at trial and [refrain from] discourag[ing] petitioner from testifying at trial for his own defense;

20) challenge [based on] actual innocence.

Petitioner asserts that appellate counsel was ineffective in failing to:

15) challenge State's brief where the State provided false testimony/information;

16) challenge trial counsel's cumulat[ive] error[.]

(Doc. No. 2 at 39).

Petitioner acknowledges that sub-claims 1–5 were the only claims from the list above that were presented to the TCCA. (Id. at 56). He asserts that, as to sub-claims 6–17, "the post-conviction counsel actually challenged them via amended petitions and [at the evidentiary] hearing," but "eventually abandoned them during appeal[.]" (Id. at 56–57).[10] As to sub-claims 18–20, Petitioner asserts that post-conviction counsel failed to "effectively challeng[e]" them in the post-conviction trial court. (Id. at 57).

In response, Respondent argues that only sub-claims 1 and 4 were properly exhausted before the TCCA (see Doc. No. 16 at 28–31), while sub-claims 2 and 3 were dismissed based on

---

[10] It does not appear that sub-claims 15 and 16 were among the "several claims" of ineffective assistance of appellate counsel that were presented to the TCCA, which included "failure to adequately communicate with the petitioner, failure to include the bill of particulars issue in the motion for new trial, and failure to include the issue of prosecutorial misconduct and certain evidentiary issues on appeal." McMath v. State, 2019 WL 2420559, at *7.

adequate and independent state grounds as described in the TCCA's opinion and are therefore procedurally defaulted. (Id. at 32–34). Respondent argues that Petitioner defaulted the remaining ineffective-assistance claims by failing to raise them on post-conviction appeal. (Id. at 34–35). Finally, Respondent argues that Petitioner cannot establish cause excusing his procedural default because the miscarriage-of-justice exception does not apply, Martinez does not apply, and no other cause has been shown. (Id. at 35).[11]

### 1. Sub-Claims Properly Exhausted on Post-Conviction Appeal

Of the sub-claims raised before the TCCA, only two sub-claims 1 and 4, related to discovery and sentencing—were presented in a way that enabled the TCCA to decide them on their merits. These properly exhausted claims of ineffective assistance of counsel are subject to the highly deferential two-prong standard of Strickland v. Washington, 466 U.S. 668 (1984), which asks: (1) whether counsel was deficient in representing Petitioner; and (2) whether counsel's alleged deficiency prejudiced the defense so as to deprive Petitioner of a fair trial. Id. at 687. To meet the first prong, Petitioner must establish that his attorney's representation "fell below an objective standard of reasonableness," and must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, [he] must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" Id. at 688–89. The "prejudice" component of the claim "focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372 (1993). It requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

---

[11] In his Reply to Respondent's arguments (Doc. No. 33 at 7), Petitioner again asserts his misperception, based on his confusion of the victim's testimony in an admissibility hearing for her testimony at trial, that Respondent's opposition to Claim 5 misrepresents the record. As previously discussed, this objection is unavailing.

proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u>

When an exhausted claim of ineffective assistance of counsel is raised in a federal habeas petition, review under AEDPA is "doubly deferential," <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009), in that "*Strickland* requires deference to counsel and AEDPA requires deference to the state court." <u>Moody v. Parris</u>, No. 20-5299, 2022 WL 3788503, at *4 (6th Cir. Aug. 30, 2022). The question in such cases is not whether the petitioner's counsel was ineffective; rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." <u>Harrington v. Richter</u>, 562 U.S. at 101. As the Supreme Court clarified in <u>Harrington</u>,

> This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

<u>Id.</u> (internal quotation marks and citation omitted).

Here, the TCCA correctly identified and summarized the <u>Strickland</u> standard applicable to Petitioner's claims of ineffective assistance. <u>McMath v. State</u>, 2019 WL 2420559, at *5–6. Accordingly, the critical question is whether that court applied <u>Strickland</u> reasonably in reaching its conclusions on sub-claims 1 and 4.

> a. <u>Sub-Claim 1: Discovery</u>

The TCCA analyzed sub-claim 1 as follows:

> Initially, the petitioner contends trial counsel was ineffective in providing discovery. While admitting trial counsel shared written discovery and discussed

23

> "the contents of the disk of evidence provided by the State" with the petitioner, the petitioner complains trial counsel was ineffective because the petitioner "never saw the actual evidence from the disk." However, other than making his claim, the petitioner failed to present any proof during the post-conviction hearing as to what discovery trial counsel failed to provide him and/or how he was prejudiced by not being able to personally review the CD in question. Thus, the petitioner has failed to meet the burden required of him and is not entitled to relief.

McMath v. State, 2019 WL 2420559, at *6.

Petitioner argues that the above analysis does not constitute an adjudication on the merits of sub-claim 1, and therefore AEDPA deference does not apply. (See Doc. No. 2 at 45). But the TCCA decided this sub-claim based on Petitioner's substantive failure to provide evidence of counsel's ineffectiveness, not his failure to comply with a state procedural requirement. See Barton v. Warden, S. Ohio Corr. Facility, 786 F.3d 450, 460 (6th Cir. 2015) ("Under *Harrington v. Richter*, '[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on its merits in the absence of any indication or state-law procedural principles to the contrary.'"). Accordingly, the state court decided the merits of this ineffective-assistance sub-claim. See Witherow v. Perry, No. 1:19-CV-169-HSM-CHS, 2019 WL 5865622, at *9 (E.D. Tenn. Nov. 8, 2019) (applying AEDPA deference to claim dismissed by TCCA on grounds that "Petitioner failed to prove deficiency or prejudice because he did not offer proof to support his claims" at post-conviction evidentiary hearing).

Moreover, the TCCA's determination was reasonable. Regardless of whether or not Petitioner discussed the CD's contents with counsel, the TCCA reasonably determined that he failed to establish prejudice resulting from counsel's refusal to produce the disk for his personal review, because he failed to offer any testimony or other proof on that score at the

evidentiary hearing. Before this Court, Petitioner attempts to prove prejudice by asserting that access to the disk would have allowed him to challenge the age of the victim at the time of the alleged offenses, based on discrepancies in "some papers" (presumably contained on the disk) related to what grades the victim was in during the relevant period. (Doc. No. 2 at 44). He claims that access to this information would have "more than likely" motivated him to file a pro se "motion to dismiss and/or change offenses from rape of a child to a statutory rape." (Id.). But even if this "proof" of prejudice could withstand scrutiny on federal habeas review, it was not made available for the state post-conviction court to scrutinize. The TCCA reasonably determined that Petitioner is not entitled to relief on this unproven claim, and AEDPA requires this Court to defer to that determination. Accordingly, Petitioner is not entitled to habeas relief on sub-claim 1.

### b. Sub-Claim 4: Sentencing

In sub-claim 4, Petitioner asserts that trial counsel was ineffective in advising him of the sentencing guidelines applicable to his offenses and the sentencing options available to him. The TCCA analyzed this claim as follows:

> The petitioner also claims trial counsel was ineffective for failing to properly advise him concerning his sentencing options. The indictment alleged that the offenses were committed between September 5, 2000, and September 4, 2003. For offenses committed prior to June 7, 2005, sentencing was governed by prior law, which provided for "presumptive" sentences. Trial courts were to enhance and/or mitigate a defendant's sentence based upon the application of enhancement and mitigating factors. *See* Tenn. Code Ann. § 40-35-210(d), (e) (2003).

> In response to *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), our legislature amended Tennessee's sentencing scheme in 2005 and eliminated presumptive sentences. The amended act also provided that the trial court set a sentence within the range and consider imposing the minimum sentence. Tenn. Code Ann. § 40-35-210(c)(1). The trial court "shall consider, but is not bound by" certain "advisory sentencing guidelines," which include that the sentence be adjusted, as appropriate, for any enhancement or mitigating factors shown. Tenn. Code Ann. § 40-35-210(c)(2). However, "defendants who are sentenced after June

7, 2005, for offenses committed on or after July 1, 1982," cannot be sentenced pursuant to the amended sentencing act without a waiver of the defendant's ex post facto protections. Tenn. Code Ann. § 40-35-210, Compiler's Notes.

Trial counsel testified that he and the petitioner discussed the fact the petitioner could choose under which act he wanted to be sentenced. According to trial counsel, "we chose one, and I believe that's on the record, and there was no issue about it at that time." Appellate counsel's testimony corroborated that of trial counsel. When questioned about the issue, appellate counsel noted he reviewed the record and recalled a discussion in open court about the petitioner's having a choice and the petitioner's making that choice. Again, we note the trial transcript, including the sentencing hearing, was not introduced as an exhibit during the post-conviction hearing, and therefore, is not included in the record on appeal. Thus, based on the testimony of trial and appellate counsel and the record before us, the petitioner has failed to prove his factual allegation that he was not properly advised of his rights and options concerning sentencing and was, therefore, sentenced under the wrong act, by clear and convincing evidence. Accordingly, the petitioner is not entitled to relief on this claim.

McMath v. State, 2019 WL 2420559, at *7.

A Tennessee post-conviction petitioner "ha[s] the burden of proving [his] allegations of fact by clear and convincing evidence." Tenn. Code Ann. § 40-30-110(f); see Johnson v. Genovese, 924 F.3d 929, 936 (6th Cir. 2019) (noting the clear-and-convincing standard of § 40-30-110(f) and observing that it "is consistent with AEDPA's own rules and standards for factual determinations"). Earlier in its opinion, the TCCA recounted the post-conviction testimony concerning sentencing from Petitioner, trial counsel, and appellate counsel, as follows:

Next, the petitioner testified counsel was ineffective for allowing him to be sentenced under the wrong sentencing act. According to the petitioner, his crimes were committed prior to the 2005 amendment to the sentencing statute, yet he was sentenced under the new statute which allowed the trial court to rely on certain enhancement factors that should not have been considered.
. . .

When questioned about the advice he provided concerning the petitioner's sentencing options, trial counsel testified they discussed the fact the petitioner had an option about "which act to be sentenced under. And we chose one, and I believe that's on the record, and there was no issue about it at that time." According to trial counsel, he met with the petitioner on two occasions prior to the sentencing hearing and advised the petitioner of his options under each act during their first meeting.

26

. . .

> When questioned specifically as to why he did not raise the issue of whether the petitioner was sentenced under the appropriate sentencing act, appellate counsel testified that his review of the sentencing hearing transcript revealed the issue had been discussed during the hearing with the petitioner and the petitioner had made an informed decision. Therefore, appellate counsel did not raise the issue on appeal.

McMath v. State, 2019 WL 2420559, at *4–5. Based on this record, the TCCA reasonably found that Petitioner's testimony did not clearly and convincingly establish that trial counsel improperly advised him to elect sentencing under the less advantageous sentencing scheme.

Even if this finding were not reasonable, Petitioner could not establish that counsel's allegedly deficient advice ultimately prejudiced him under Strickland. The record before this Court—which includes the transcript of Petitioner's sentencing hearing—reveals that the trial court accepted counsel's election "to start at the bottom end" of the sentencing range (consistent with a presumption under the old scheme) but indicated that its sentence for the Class B aggravated-sexual-battery felonies and the Class A child-rape felonies was appropriate "either way," apparently because of the applicable statutory enhancement factors and a lack of mitigating factors.[12] (Doc. No. 15-7, Sentencing Hearing Transcript, at 15; Doc. No. 15-1 at 54–61 (reflecting Petitioner's offender status and class of his crimes)). And, as the TCCA found on direct appeal from Petitioner's sentence, "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 [Sentencing Reform] Act, as amended in 2005," which the trial court did not do in ordering Petitioner to serve

---

[12] See State v. Bise, 380 S.W.3d 682, 692 (Tenn. 2012) (reciting that, under old sentencing scheme, "[i]f enhancement but not mitigating factors were present, the trial court could set the sentence for a Class B, C, D, or E felony 'above the minimum in that range but still within the range,'" and "for a Class A felony, the trial court was required to 'set the sentence at or above the midpoint of the range'") (quoting Tenn. Code Ann. § 40–35–210(d) (Supp. 2001)).

consecutive, enhanced sentences. State v. McMath, 2013 WL 5918733, at *10–11 (quoting Bise, 380 S.W.3d at 706). Petitioner is not entitled to habeas relief on sub-claim 4.

### 2. Sub-Claim 3

While the TCCA recognized Petitioner's claim (asserted in this Court as sub-claim 3) that "trial counsel was ineffective for failing to request 'the case be dismissed' because the 'victim testified at trial that she was not touched in the vaginal area, as alleged by the State in the Election of Offenses,'" it did not dispose of that claim. McMath v. State, 2019 WL 2420559, at *7. Rather, the court merely noted (1) that Petitioner failed to specify which charges he believes should have been dismissed, and (2) that he failed to introduce the trial transcript into the post-conviction record, leaving the TCCA to rely on the summary of the evidence provided in its decision on direct appeal. Id.

Regardless of whether the TCCA's limited treatment of this claim implies that it viewed the claim as unexhausted, defaulted, or without merit, this Court may deny sub-claim 3 on its merits. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). The only claim that Petitioner makes regarding prejudice from the allegedly deficient failure to seek dismissal is in his supporting Memorandum, where Petitioner again cites the victim's testimony to only two incidents of abuse during the pretrial Rule 404(b) admissibility hearing, and argues that he was prejudiced "by standing trial for extra six (6) counts without trial testimony" when those counts "more than likely[] would have been dismissed" had counsel filed a motion. (Doc. No. 2 at 49–50). Because the premise of this argument is simply mistaken, as described above, the Court finds sub-claim 3 to be unfounded and without merit.

3. <u>Defaulted Sub-Claims</u>

a. <u>Sub-Claims 2 and 5: Denied on Procedural Grounds</u>

Sub-claims 2 (concerning cross-examination of witnesses) and 5 (concerning the State's closing argument) were raised before the TCCA but disposed of on procedural grounds, as described below:

> Next, the petitioner claims trial counsel was ineffective for failing to adequately cross-examine witnesses and point out inconsistencies in their testimony. However, the petitioner fails to provide examples or arguments in support of his claim as to how trial counsel's actions prejudiced his case. A brief shall contain "[an] argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on." Tenn. R. App. P. 27(a)(7). Failure to comply with this basic rule will ordinarily constitute a waiver of the issue. Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); *State v. Thompson*, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000) (determining that issue was waived when defendant cited no authority to support his argument on appeal). The petitioner does not support this claim with any argument or authority; consequently, it is waived.
>
> . . .
>
> The petitioner's final claim regarding trial counsel is that trial counsel was ineffective for failing to object to portions of the State's closing argument. However, the petitioner fails to support his claim with any argument or citations to the record or appropriate authorities; therefore, the petitioner has waived consideration of this claim. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b); *Thompson*, 36 S.W.3d at 108.

<u>McMath v. State</u>, 2019 WL 2420559, at *6–7.

"A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment," such as a state procedural rule. <u>Walker</u>, 562 U.S. at 315. Here, the TCCA rejected sub-claims 2 and 5 under the waiver provision of Tennessee Court of Criminal Appeals Rule 10. The Sixth Circuit has "recognized that Rule 10 of Tennessee's criminal rules is a 'firmly

established and regularly followed' rule, and therefore 'adequate'" grounds to dismiss a claim independent of the federal question it attempts to raise. Mathis v. Colson, 528 F. App'x 470, 478 (6th Cir. 2013) (quoting Middlebrooks v. Bell, 619 F.3d 526, 535–36 (6th Cir. 2010) (finding that claims denied under Tenn. Ct. Crim. App. R. 10(b) and Tenn. R. App. P. 27(a)(7) are defaulted) (judgment vacated on other grounds)). Accordingly, Petitioner procedurally defaulted sub-claims 2 and 5. Because he has failed to "argue cause and prejudice for his failure to meet the state procedural rule," the merits of these sub-claims cannot be reviewed in this Court. Mathis, 528 F. App'x at 478.

### b. Sub-Claims 6–20: Ineffectively Raised or Abandoned during Post-Conviction Proceedings

As noted above, Petitioner asserts that sub-claims 6–17 were raised in the post-conviction trial court "via amended petitions and [at the evidentiary] hearing," but "eventually abandoned" on appeal. (Doc. No. 2 at 56–57). The TCCA agreed that Petitioner had "alleged a number of instances of ineffective assistance in his petition and at the evidentiary hearing . . . [but] confine[d] himself on appeal to arguing" only a few of those claims. McMath v. State, 2019 WL 2420559, at *3. By initially raising sub-claims 6–17 but failing to pursue them after the post-conviction trial court found that his testimony was not credible, and that he had failed to establish prejudice from any deficiency in counsels' performance (Doc. No. 15-17 at 5), Petitioner defaulted these sub-claims on post-conviction appeal. Because Martinez does not operate to excuse procedural default caused by the ineffective assistance of counsel on post-conviction appeal, but only on *initial* post-conviction review, Davila, 137 S. Ct. at 2063, and because Petitioner has not made any other showing of cause for the default, sub-claims 6–17 cannot be reviewed in this Court.

With regard to sub-claims 18–20, which Respondent claims were defaulted when they were not "effectively challeng[ed]" in the post-conviction trial court, Petitioner's attempt to show cause

for the default under <u>Martinez</u> is unavailing. The Sixth Circuit has instructed district courts, in analyzing cause for a procedural default under <u>Martinez</u> and its progeny, to determine "(1) whether state post-conviction counsel was ineffective, . . . and (2) whether [Petitioner's] claims of ineffective assistance of counsel were 'substantial' within the meaning of *Martinez*, *Sutton*, and *Trevino*." <u>Atkins v. Holloway</u>, 792 F.3d 654, 660 (6th Cir. 2015) (internal citations omitted). Whether post-conviction counsel was constitutionally ineffective is necessarily connected to the strength of the claim he failed to raise, so "in many habeas cases seeking to overcome procedural default under *Martinez*, it will be more efficient for the reviewing court to consider in the first instance whether the alleged underlying ineffective assistance of counsel was 'substantial' enough to satisfy the 'actual prejudice' prong of *Coleman*." <u>Thorne v. Hollway</u>, No. 3:14-cv-0695, 2014 WL 4411680, at *23 (M.D. Tenn. Sept. 8, 2014), <u>aff'd sub nom. Thorne v. Lester</u>, 641 F. App'x 541 (6th Cir. 2016).

Here, even assuming that Petitioner's counsel on initial post-conviction review was ineffective in presenting his claims that trial counsel failed to adequately advise him regarding plea negotiations or to deliver the state's 10-year offer to him (sub-claim 18), advise him concerning whether to testify in his own defense (sub-claim 19), or assert his actual innocence (sub-claim 20), none of those sub-claims is substantial.

Sub-claims 18 and 19 were developed in testimony at the evidentiary hearing in response to questioning by both post-conviction counsel and the State's attorney. Petitioner gave the following testimony regarding these sub-claims in response to his counsel's questioning:

> Q.    Okay. And when you say you had communication issues, did you talk about possible, did he talk about possible offers that the state made?
>
> A.    Yeah. He told me about one offer. It was a probation. And then when I told him, this was way later on, I told him I'll take it, he said it wasn't probation. He said it was time in the penitentiary.

31

Q.      So your understanding was that at some point you had an offer for probation and then it changed?

A.      Yeah. That's what I, the whole time, the whole entire time I was under the impression that it was ten years['] probation.

Q.      Did he explain to you that D.A.s are able to change their offers?

A.      No. He didn't explain that to me.

Q.      I just want to make sure that we understand about counsel, I mean your inability to communicate with Mr. Colavecchio. Did you and he talk about at trial whether or not you would testify?

A.      Okay. I think that did come up about me testifying.

Q.      Okay. And did y'all discuss the pros and cons?

A.      I'm sorry?

Q.      Did you discuss the pros and cons?

A.      No. No, ma'am.

Q.      So y'all didn't have any discussions about whether or not you would've –

A.      No. I was just asked, asked if I wanted to take the stand.

Q.      Is that in the open court during the trial or was that in the back with Mr. Colavecchio?

A.      It was that day.

Q.      Was it in open court or was it in the back?

A.      It was in the court. It was right when we was sitting at the table.

Q.      Was it the judge asking you if you chose to testify or not?

A.      No. Well, Me and Colavecchio talked about it at the table.

Q.      So y'all did talk about it a little bit. What did you talk about?

A.      Just if I wanted to take the stand.

Q. Okay. So y'all –

A. And he had me to sign some paper right on that table.

Q. It's your testimony today under oath that before that moment, before the judge had you sign a thing stating you weren't going to testify, that y'all never had that conversation outside the courtroom?

A. No. No.

(Doc. No. 15-18 at 11–13). Upon cross-examination by the State, Petitioner further testified

as follows:

Q. I'm asking you a different question now. I'm asking you about you discussed about a potential plea agreement, correct? A potential plea; right?

A. Yes, ma'am.

Q. In fact, the first plea that he spoke to you –

A. And the only one that I was aware of was the probation, ten years['] probation.

Q. Okay. And that was in 2009, he came to you and said that you had been offered ten years['] probation; right?

A. Yeah.

Q. But you didn't accept that, did you?

A. At the time, I didn't.

Q. Okay. And then as trial got closer and the state's, and Mr. Colavecchio and everybody is working and getting ready for trial, there was another plea agreement that was brought to you; right?

A. No. It was the – That's, after that first time, we never discussed no more plea. I was under the impression all the way up until I told him, I asked him, I told him I'll go ahead, I want to take it. And that's when he told me then that it wasn't probation, it was time in the penitentiary, ten years in the penitentiary.

Q. But as you just testified, you, at first, said you didn't want the ten years['] probation. At first, you said no, I don't want it; correct? Nobody put a gun to your head. You said you didn't want it at first; correct? In 2009; correct?

A.     My mind wasn't made up.

Q.     Okay.

A.     It wasn't that I didn't want it. I just was undecided at the time.

       . . .

Q.     Okay. But you did not take it in 2009. And then in 2010, on October the 25th, 2010, you were then offered ten years.

A.     No. He [(trial counsel)] did not offer me nothing. Again, that was the first thing I heard. The next time it was mentioned is when I brought it up to him [(in 2010)] and told him that I will take it. That's when he told me that it wasn't probation, that it was time in the penitentiary.

       . . .

Q.     . . . At that time, you did not accept the ten years in prison offer, did you?

A.     I had to think about it.

Q.     Okay. That's a no; correct?

A.     No, it's not. It's something I had to think about.

(Doc. No. 15-18 at 50–55).

       The State then called trial counsel, Mr. Colavecchio, who testified that Petitioner rejected

the State's plea offers of 10-years' probation in 2009 and 10-years' incarceration in 2010:

Q.     Now, let's talk about the plea agreement. After speaking with him, looking at discovery, listening to the CD, et cetera, talking to investigators, did you speak to the D.A. about a potential plea?

A.     Yes. General Riddick and I had had a conversation at some point, I don't know if it was here at the courthouse or at her office or over the phone. But the first offer that was discussed, it was very early on, I do remember that, was for ten years of probation. And I even wrote a note to myself on a sticky note and attached it to a plea petition and put it in the file, and that was, and then I related it to Mr. McMath. And, at the time, he still denied that he had done, well, he probably still does, but he denied that he did this and he wasn't going to take any offer that involved any punishment.

Q.     Okay.

34

A.        And then second, approximately a year later, maybe a little more than a year later, General Reddick had obviously gotten a lot further into the case, I think we were close to the first time it was set for trial. I think it was set for trial at least once or twice. And because of the, well, I'm assuming this, I'm assuming because the victims were so adamant about the allegations, and I say the victims, the victim and the victim's mother were so adamant about the whole scenario, that she withdrew the probation part of it and said that he could take ten years, but it would have to be to serve.

Q.        And did you relay that information to the defendant?

A.        Yes. Yes. And Mr. McMath not only turned it down but was mad because it had gone up, which doesn't make any difference. But, you know, he wasn't going to take the first one, so he sure wasn't going to take the second one.

Q.        And certainly isn't unusual in a criminal case?

A.        No. Not unusual at all.

Q.        Okay.

A.        And that one, by the way, the second, I do remember the second plea offer, the ten years to serve, was made here at the courthouse on a court date where Mr. McMath was present, and I had actually written up a plea petition because he had somewhat at first indicated he might take it or at least he was thinking about it. And then when I went and showed it to him, I guess maybe seeing it on paper was a little different and he wouldn't sign it and wouldn't, obviously, accept it. So he denied, he turned it down in writing.

Q.        And you still kept that in your file?

A.        Yes.

Q.        And that would be dated October the 25th, 2010?

A.        That sounds right, yeah.

(Id. at 68–71).

Trial counsel further testified as follows with respect to the decision not to call Petitioner

as a witness to testify at trial:

Q.        And, in addition to that, regarding the trial, he elected not to testify at the trial, either?

35

A.     That's correct. And he did make, and he was correct today, make that determination himself long before the trial actually occurred, and we discussed why anyway, because I felt like he needed to understand my thought on it, because he had a serious felony record.

Q.     Notice of Enhancements had been filed of his other felonies?

A.     Yes. And I forget how many. It was eight or ten or somewhere in that range that was going to be used if he did testify. And I felt like if the jury heard several years['] worth, it wasn't all just very, very recent. There was some that was several years old, several felony convictions in different jurisdictions, if I remember right. Even some were in another state. It wasn't just here. That it would not serve him very well and his credibility would have been severely hurt, I believed, had he testified and all of that came out, among other reasons.

Q.     And you explained all of that to him and he made a choice?

A.     Yes. He made a choice. We conducted a Momon hearing[13] here in the courtroom without the jury present, and he admitted that that was his choice.

(Id. at 78–79).

As long as the record supports the post-conviction trial court's finding that Petitioner's testimony was not credible with regard to counsel's alleged deficiencies in communicating plea negotiations or advising whether Petitioner should testify, this Court must defer to that finding. Watkins v. Settles, No. 3:17-CV-01321, 2019 WL 4038338, at *18 (M.D. Tenn. Aug. 27, 2019) (citing Rice v. Collins, 546 U.S. 333, 339 (2006) ("Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination.")). Petitioner now alleges that he was "very interested" in the State's plea offer of ten years in prison but declined it because counsel "was very positive for the outcome of the trial" and "wrongly guided that Petitioner would be sentenced [to] 15 years if found guilty." (Doc. No. 2 at 75). He claims that "[a]fter hearing that there are only 5-years difference between trial and guilty plea from his trial counsel, Petitioner chose to take a trial in an

_____

[13] (See Doc. No. 15-4 at 2–4).

effort to prove his innocence." (Id.). But this claim is not consistent with Petitioner's post-conviction testimony, quoted above, that focused on counsel's failure to inform him that the 2009 offer of probation would no longer be on the table over a year later, and on his indecisiveness upon learning of the 2010 offer of 10 years in prison. It was entirely reasonable for the post-conviction court to reject Petitioner's testimony regarding plea negotiations in favor of counsel's more plausible testimony.

Moreover, the state court reasonably rejected Petitioner's testimony that counsel failed to discuss or give competent, timely advice regarding whether Petitioner should testify in his own defense, particularly in light of the record showing that the State filed, long before trial, its "Notice of Intent to Use Convictions or Prior Bad Acts for Impeachment Purposes" should he testify, which identified nine prior felony convictions. (See Doc. No. 15-1 at 20–21, filed and served on March 31, 2010). Petitioner now asserts that counsel's advice was deficient because "the case was largely depende[nt] on the credibility between the accusers and Petitioner," and his testimony would have supported his innocence by revealing (1) the financial conflict between him and the victim's mother, who "used to threat[en] Petitioner for financial support"; (2) that the victim "did not smoke marijuana when they live[d] together, therefore, the marijuana-video-sex incident . . . never happened"; and (3) that the victim "was a fine young girl until she was in . . . eighth grade," when Petitioner suggests something about her changed. (Doc. No. 2 at 76–77). But the record, in addition to including the State's notice of intent to impeach Petitioner using his lengthy criminal history, fails to support the notion that the jury would have credited Petitioner if he had testified to his innocence, given the State's direct evidence of abuse from the testimony of the victim and her older brother; the victim's mother's testimony that it was she who financially supported Petitioner

out of fear (see Doc. No. 15-3 at 109–110); and the evidence that Petitioner mailed an apparent threat to the victim's mother just prior to trial. (See id. at 101–07).

For these reasons, the allegations of ineffective assistance of trial counsel made in defaulted sub-claims 18 and 19 do not support a finding of prejudice under Strickland and are therefore not substantial. Atkins, 792 F.3d at 660; Thorne, 2014 WL 4411680, at *23. Accordingly, any ineffectiveness of post-conviction counsel in failing to effectively present these sub-claims does not amount to cause excusing their default under Martinez, and the Court may not entertain them.

As to sub-claim 20—that trial counsel "did not properly develop[] Petitioner's actual innocence theory as an ultimate defense strategy" in light of the alleged implausibility of the victim's allegations and the delay in making them, the absence of physical evidence of assault, and the victim's mother's potential motive of financial gain (Doc. No. 2 at 77–78)—this claim is repetitive of Petitioner's arguments in support of his claim that counsel improperly advised him not to testify, and likewise fails to demonstrate any deficiency in counsel's performance. See Nance v. Mississippi, No. CIV.A. 107CV307SAJAD, 2010 WL 1418015, at *4 (N.D. Miss. Feb. 23, 2010) ("Nance complains his attorney put on no proof in response to the state's case," but "[a]s far as the record shows, the only available witness willing to offer exculpatory testimony would have been Nance himself, [and] he elected not to testify. There is no showing of deficient performance by counsel in this regard."). Accordingly, for the same reasons given with regard to sub-claim 19, sub-claim 20 is also insubstantial and its default unexcused. It is therefore barred from further review in this Court.

## VI. MOTION TO AMEND THE PETITION

Finally, Petitioner's Motion to Amend his Petition based on newly discovered evidence (Doc. No. 32) will be denied. In this Motion, Petitioner "avers that he recently received the sworn

affidavit of Darryl K. Hawk [executed] several years ago [in 2018]," in which Mr. Hawk (the victim's older brother) swears under oath that he did not want to testify at Petitioner's trial but was coerced into testifying by the prosecution, and that he "lied and made false statements about" Petitioner during that testimony. (Id. at 6–7). No further detail about the number or content of Mr. Hawk's allegedly false statements is provided. This recantation affidavit was apparently procured by Mr. Charles E. McMath, whose own affidavit states that he drove to Mr. Hawk's place of employment on September 3, 2018 and witnessed Mr. Hawk sign the recantation affidavit "free of any promises, threats or coercion and on his own free will." (Id. at 8).

A petition for writ of habeas corpus may be amended pursuant to Federal Rule of Civil Procedure 15. See 28 U.S.C. § 2242 (petitions "may be amended or supplemented as provided in the rules of procedure applicable to civil actions"). At this stage in the case, Petitioner may amend the Petition only with the Court's leave or Respondent's written consent. Fed. R. Civ. P. 15(a). Respondent does not consent. Courts "freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). Two factors considered when "evaluating the interests of justice" are "undue delay in filing" and "futility of amendment." Oleson v. United States, 27 F. App'x 566, 569 (6th Cir. 2001) (quoting Coe v. Bell, 161 F.3d 320, 341 (6th Cir. 1998)).

Here, not only has Petitioner failed to act with due diligence in waiting until 2022 to introduce an affidavit that was procured in 2018 and recants testimony given in 2011, but amendment of the Petition to introduce the recantation affidavit would be futile. The Sixth Circuit has cautioned that affidavits by trial witnesses recanting their testimony are to be "viewed with extreme suspicion," and "even if accepted, . . . are generally not sufficient to grant habeas relief absent constitutional error." Welsh v. Lafler, 444 F. App'x 844, 850 (6th Cir. 2011) (citations and internal quotation marks omitted). Mr. Hawk's affidavit fails to provide any detail at all regarding

the scope of his recantation; it merely reports "[t]hat during [his] testimony," he "lied and made false statements about Denver McMath" in order "to appease the district attorney's office." (Doc. No. 32 at 6). Furthermore, as in <u>Welsh</u>, there is no evidence in this case that the recanting affidavit was filed and considered in state court or that it was corroborated by other evidence of record. In fact, to the extent that Mr. Hawk intended his recantation to encompass his testimony that he revealed his knowledge of Petitioner's crimes during a 2007 argument with the victim in front of their mother, that testimony was corroborated by both the victim and the mother. (<u>See</u> Doc. No. 15-3 at 37–42, 93–96). Accordingly, "the recantation here is an insufficient basis upon which to grant habeas relief," <u>Welsh</u>, 444 F. App'x at 850, and amendment of the Petition to include it would be futile.

## VII. CONCLUSION

For the reasons given above, the Petition for Writ of Habeas Corpus (Doc. No. 1) and Petitioner's Motion to Amend Petition (Doc. No. 32) will be **DENIED**, the motions to extend time and to appoint counsel (Doc. Nos. 34 & 36) will be **DENIED AS MOOT,** and this matter will be **DISMISSED** with prejudice.

The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a Section 2254 petitioner. Rule 11, Rules Gov'g § 2254 Cases. A petitioner may not take an appeal unless a district or circuit judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2). A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336

(2003) (citations and internal quotation marks omitted). "[A] COA does not require a showing that the appeal will succeed," but courts should not issue a COA as a matter of course. Id. at 337.

Because reasonable jurists could not debate whether Petitioner's claims should have been resolved differently or deserve encouragement to proceed further, the Court will deny a COA. Petitioner may seek a COA directly from the Sixth Circuit Court of Appeals. Rule 11(a), Rules Gov'g § 2254 Cases.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE